IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 17, 2010 Session

**STATE OF TENNESSEE v. JAMES G. MCCREERY, JR.**

**Direct Appeal from the Circuit Court for Rutherford County**
**No. 62440     Don R. Ash, Judge**

---

**No. M2009-02082-CCA-R3-CD - Filed December 30, 2010**

---

A Rutherford County jury convicted the Defendant, James G. McCreery, Jr., of use of a
weapon during a felony, felony reckless endangerment, criminal trespass, and two counts of
reckless aggravated assault, and the trial court sentenced him to a three-year suspended
sentence. On appeal, the Defendant contends that the evidence is insufficient to support his
conviction for criminal trespass and that the trial court improperly instructed the jury as to
self-defense. After a thorough review of the record and the applicable law, we affirm the
trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES
and NORMA MCGEE OGLE, JJ., joined.

John H. Baker, III (on appeal), Murfreesboro, Tennessee, and William B. Bullock (at trial),
Murfreesboro, Tennessee, for the Appellant, James G. McCreery, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General;
Clarence E. Lutz, Assistant Attorney General; William Whitesell, District Attorney General;
Trevor Lynch, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant shooting the victim, Jeffrey Davis, on the victim's
property. Based on this conduct, a Rutherford County grand jury indicted the Defendant for
use of a firearm during a felony, reckless endangerment, criminal trespass, and two counts of
aggravated assault. The following evidence was presented at the Defendant's trial: Bobbie

Wilson, a Rutherford County Sheriff's Department communications officer, testified that on July 18, 2008, she received a 911 call from the Defendant. An audio tape of the telephone call was played for the jury. On the tape, the Defendant, who was at work, reported that he had just been speaking with his wife by telephone when he heard his neighbor, the victim, come to their front door and threaten his wife. The Defendant explained to the operator what he believed led the victim to threaten his wife. He said that the victim, who lived four houses down from the Defendant, coached the victim's daughter's soccer team. According to the Defendant, around 2:30 a.m. the night before, five carloads of these soccer players drove around the neighborhood, creating a great deal of noise. Later that day, the Defendant's wife told the victim's daughter to tell her father she "didn't appreciate that."

The Defendant said, "I'm fifty-three miles away and I could go home and handle this but you'll be taking me away," and, "The problem is, I could go over there, but this will certainly escalate." As a result of this phone call, Wilson dispatched an officer to the Defendant's home.

James Davis, a Rutherford County Sheriff's Department deputy, testified that, on July 19, 2008, he responded to a call on Jeter Way based upon the report of a shooting. Upon arrival, Deputy Davis observed the victim, bleeding from his left leg, sitting in his garage with his wife. The couple informed the deputy that the Defendant with the pistol, was "down the street." The Deputy saw the Defendant several houses down, "holding his hands in the air." The deputy approached the Defendant and asked the location of the gun. The Defendant told the deputy it was unloaded, lying on the front seat of the Defendant's truck. The Deputy then took the Defendant into custody.

Deputy Davis retrieved a "silver-type, small .380 caliber weapon" from the front seat of the Defendant's truck. The gun was unloaded, and a magazine and a single round were also lying on the front seat.

Heather Miller, a Rutherford County Sheriff's Department communications officer, testified that she received a 911 call from the Defendant on July 19, 2008. The phone call was recorded and played for the jury. On the 911 audiotape, the Defendant said, "I was attacked by my neighbor, and I shot him in the leg." A deputy was dispatched, but Miller kept the Defendant on the phone while the deputy was en route. During the phone conversation with Miller, the Defendant answered all questions Miller asked and recounted the events for which he had previously called 911. The Defendant told Miller that a deputy came to his home in response to his call reporting the victim's threats against his wife and told the Defendant nothing could be done. The Defendant said that, after receiving this news from the deputy, he was driving by the victim's house and noticed the victim standing outside, so he stopped in order to speak with the victim and resolve their disagreement. The Defendant said that, after speaking with the victim, he turned away to get into his truck, and the victim attacked him from behind. After giving this version of the attack, at Miller's instruction, the Defendant

unloaded his gun and left it in his unlocked truck.

Jeffrey Davis, the victim, testified that he had lived with his wife and two daughters on Jeter Way for three years. The victim recalled that his daughter's soccer team was initiating the freshmen players on the night of July 18. At approximately 2:30 a.m., five or six carloads of these soccer players picked up his daughter. Unfamiliar with the neighborhood, the cars took several wrong turns leaving the neighborhood, which resulted in their making u-turns and pulling into various driveways before they left the neighborhood. The victim acknowledged that the car stereos were playing loudly and that the girls were screaming. Later that day, the Defendant's wife confronted the victim's daughter about the noise and commotion. The victim's daughter was very upset and told her father that the Defendant's wife "cussed" at her.

The victim testified that he went to the Defendant's house and "argued for probably ten, fifteen minutes" with the Defendant's wife. The victim said that, before this, he had never met the Defendant's wife and had spoken only briefly with the Defendant. The victim said the Defendant's wife was in her driveway when he approached her and that both parties were "cussing" at one another. The victim said he was "extremely" upset and told the Defendant's wife that she should address the victim rather than his children if she had a problem. The victim denied threatening the Defendant's wife testifying, "I told her to leave my child alone, that if she needed to speak with someone she needed to speak with me and that obviously she didn't know who she was f[-]ing with."

The victim recalled that, during his conversation with the Defendant's wife, the Defendant's wife's cell phone rang. The victim assumed it was the Defendant. The victim recalled:

> I told [the Defendant's wife] that if [the Defendant] did not want me to talk to her that we could settle it the next day. That I wouldn't talk to her. That I'd go home. But she was pretty aggressive. She hung up on her husband. And she wanted to argue. And so I argued with her.

The victim denied going to the Defendant's door, having any physical contact with the Defendant's wife, or making any physical threats. The victim said his interaction with the Defendant's wife ended when his own wife came down the street and told him to come home.

The victim testified that, later that evening, he was sitting on his porch when he noticed a sheriff's car at the Defendant's house, so he walked down and spoke with the deputy. The victim said he and the Defendant's wife both had their "say," and the deputy "refereed." The victim said that it was not a friendly exchange and that they were both upset but recalled that they both said they were sorry it happened, and the victim returned to his house.

The following day, the victim was coming out of his garage when he saw the Defendant standing in his driveway. The Defendant asked the victim to talk with him, saying they needed to "get this matter settled." The victim told the Defendant to go home because it was already settled and over. The victim provided the following account of what next occurred:

> [The Defendant] told me that I was real big around women and I ain't shit around men and I like picking on women and that he was going to kick my ass. And I asked him did he want some. And obviously he said no because I started moving towards him and he backed up. So when I saw he backed up I stopped where I was. We began to cuss each other out and talk to each other. And he was getting madder and I was getting madder and finally I'd had enough. And I told him to get out of my yard, he was trespassing. And I started walking towards him. And he started backing up. And I backed him up to the edge of the driveway. And he stepped into the street and I stopped where I was. And we stood there and fussed at each other a little bit longer and he stepped back in my yard again. So I started moving towards him and he backed up towards his truck. And then I got a little closer and he got - - I don't know. Probably three feet away from the door. I was probably standing about the tail of his truck. And we kind of just stared each other down for a little bit. And all of a sudden he made a jerking motion towards the cab of his truck with his arm out down low and turned to the outside. I figured he was going for something so I jumped on him.

The victim testified that he hit the Defendant three or four times with his fist. The victim said that he and the Defendant were "inside the arc of the door swing," within two feet of the Defendant's truck. The victim said the Defendant never tried to hit him or block his punches but instead continued "reaching for something." The victim saw a black gun and grabbed the Defendant's forearm, but within seconds the victim was shot on the inside of his left leg. The victim ran into his garage.

The victim was transported to the hospital for treatment. He described the pain as "pretty excruciating." As a result of the gunshot, there is permanent damage to the surface nerve endings in his leg. The victim testified that, at the time of trial, he still experienced pain in his leg.

On cross-examination, the victim acknowledged that he approached the Defendant's wife, whom he had never met, at night and screamed at her, "When you f*** with my kid you're f***ing with me." The victim agreed that the Defendant's wife told him to leave and that he told the Defendant's wife to "get the f*** off her phone." He also acknowledged that he knew the Defendant's wife was on the phone with the Defendant who could hear the conversation, and that the victim said, "If [the Defendant] wants some of me he can come get

it."

The Defendant testified that he and his wife had lived on Jeter Way almost three years. The Defendant said that, at the time of these incidents, he worked night shifts at Yellow Roadway Corporation. He recalled that, while speaking with his wife over the telephone from work, he set his phone down to respond to an employee. When he picked his cell phone back up, he heard a man cussing and screaming at his wife. The Defendant said he kept asking his wife what was happening, but she did not respond. The Defendant said he felt fear for his wife, so he called 911 on another phone. The Defendant remained at work that night because he was an hour and fifteen minutes away, and he knew that a sheriff's deputy had been dispatched to check on his wife.

The Defendant testified that, when he arrived home, his wife gave him more details of the argument with the victim and that she then left for work. The Defendant waited until around 7:00 a.m. and then went to the victim's house in an attempt to "resolve this matter," but no one answered the door. The Defendant returned home and went to sleep. Around 1:00 p.m. he got up and prepared to run some errands. As he was getting ready to leave, he noticed the victim and his wife drive past the Defendant's house, so he got into his truck and drove down to the victim's house. The Defendant recalled that, as the victim exited his garage, he asked the victim, "What's going on? What's the problem here? . . . [C]an we fix this?" The Defendant said that the victim told his wife and daughter to go into the house, and the Defendant immediately told the victim, "It ain't got to be like that. I came here to talk to you like a man." The victim told the Defendant to get the "F-U-C-K off his property" and then started waving his hands in the air and screaming, "Do you want some? Do you want some?"

The Defendant testified that he began backing up because he realized "[the victim] was too crazy to deal with." The Defendant agreed that he told the victim, "Oh, I get it. You can only go after women. You can't talk to a man." The Defendant said he prepared to defend himself and reached for his cell phone to remove it from his person so it would not get damaged should the victim assault the Defendant, and he positioned his feet "to go." The Defendant recalled that the two men paused briefly in the middle of the victim's driveway but then the victim screamed for the Defendant to "get [his] fat ass out of there." The Defendant continued to back up and, once he was behind his truck in the street, the victim began threatening to "kick [the Defendant's] ass." The victim again told the Defendant to "get [his] fat ass out of here." The Defendant said that this comment struck him as "funny," and he responded to the victim saying, "Imagine that. You calling anybody fat." The Defendant then turned and walked toward his truck, opened the door, and, as he placed one hand on the steering wheel and one foot on the floorboard, the victim began hitting the Defendant from behind. The Defendant testified that he was "scared" and attempted to cover himself, but he was pinned in the corner of the truck's door jam. The Defendant said he was bleeding from his nose and began to "fog up." The victim had hit the Defendant eight or nine times, so the Defendant turned and reached for the gun in his door panel with his right hand. The

Defendant explained he kept the gun in his car for protection because he worked in a "pretty bad" part of Nashville. The Defendant said he reached for the gun "to stop the beating" and "to defend [him]self." The Defendant said the gun went off, and the victim continued to hit the Defendant four or five more times and then fled.

The Defendant testified that he put the gun in his truck and called 911 to request an ambulance and a police officer. The Defendant waited in his driveway until the police arrived several minutes later. The Defendant denied ever going back on to the victim's property after he left it. The Defendant said he never charged or attacked the victim and that the victim never retreated.

On cross-examination, the Defendant acknowledged that he did not tell the dispatcher during the first 911 call or deputies that the victim specifically threatened the Defendant, his wife, and their dog. The Defendant agreed that he did not file charges against the victim but explained that, based on the discussion with the officer who came to the house, he did not think that was an option. The Defendant maintained that he was parked on the street in front of the victim's house and that the entire incident lasted three to five minutes. The Defendant agreed that he did not have a handgun carry permit at the time of this incident although, he had acquired one by the time of the trial. The Defendant testified that the blows he received from the victim left him with swelling and knots on the back of his head, but he did not sustain any bruising or broken bones.

The Defendant's wife, Ida Rose McCreery, testified that on July 18, 2008, she was getting groceries out of her car while talking to her husband on her cell phone when she heard the victim scream, "When you f*** with my kids, you're f***ing with me." McCreery recalled that the victim was accompanied by his daughter and that it was starting to get dark when the victim and his daughter approached her. McCreery explained that the victim was referring to an exchange she had with the victim's daughter earlier that day. McCreery said that she was at a neighbor's house and she asked the victim's daughter what the soccer team was doing at McCreery's house at 2:30 a.m. and that she didn't "know whose idea that was but you can tell them for me it was a pretty dumb ass thing to do." McCreery said that the victim's daughter apologized, and McCreery told the victim's daughter, "Oh, honey, I'm not blaming you. It's not your fault."

The victim began accusing McCreery of cussing at his daughter and McCreery denied doing so. The victim told McCreery, "Get off that f***ing phone." McCreery told the victim she was on the phone with her husband, to which the victim responded, "Tell him if he wants some of me come and get it." McCreery told the victim to get off her property, but the victim continued to tell McCreery that she did not know who he was or what he was capable of. The victim reiterated that she wanted the victim to leave to which he responded, "I'll take care of you, your husband and your dog." The victim told McCreery she should just "deal with getting woken up at 2:30 in the morning," because he had never complained when McCreery's

dog had woken him up by barking.

During the exchange between McCreery and the victim, McCreery asked the victim's daughter if McCreery had cursed or yelled at the victim's daughter. The victim's daughter agreed that McCreery did not curse or yell at her but said that McCreery used curse words. The victim then got "nose to nose" with McCreery and screamed, "That's what I wanted to hear." McCreery again instructed the victim to leave her property. The victim continued to call McCreery names and yell at her until the victim's wife appeared and pulled him away. As the victim walked away, he said, "Get your fat ass in your house."

McCreery testified that Deputy Scott Appleton came to the house, and she told the deputy that she wanted the victim arrested because he came onto her property, threatened her, and did not leave when she asked the victim to do so.

On cross-examination, McCreery agreed that, on the videotape of her conversation with the officer, she never stated she wanted the victim arrested although she maintained that she did, at some point, tell the deputy she wanted the victim arrested for his conduct. McCreery also agreed that, on the videotape, she told Deputy Appleton, "I told [the victim's daughter] that that was stupid as hell and I didn't appreciate that one damn bit." McCreery maintained, however, that her statement to the victim's daughter was that "it was a pretty dumb ass thing to do and that I didn't appreciate worth a damn being woken up at 2:30." McCreery agreed that she never told Deputy Appleton that the victim was "nose to nose" with her. McCreery agreed that she told the victim "to get the F off [her] property."

Based upon this evidence, the jury convicted the Defendant of use of a weapon during a felony, felony reckless endangerment, criminal trespass, and two counts of reckless aggravated assault. The trial court merged the reckless aggravated assault and reckless endangerment convictions and sentenced the Defendant to three years. The trial court sentenced the Defendant to one year for the use of a firearm conviction and thirty days for the criminal trespass conviction. The court ordered the sentences to run concurrently for an effective sentence of three years. The court suspended the Defendant's sentence, allowing the Defendant to serve his sentence on probation.

## II. Analysis

The Defendant asserts that the evidence is insufficient to sustain his criminal trespass conviction and that the trial court erred in refusing to instruct the jury, pursuant to Tennessee Code Annotated section 39-11-611( C ), that a person using force while in his vehicle is presumed to be acting in self-defense.

### A. Sufficiency of the Evidence as to the Criminal Trespass Conviction

The Defendant asserts that the evidence is insufficient to sustain his criminal trespass conviction because the evidence did not establish that he returned to the victim's property after his retreat. The State counters that sufficient evidence was presented from which a reasonable juror could conclude that the Defendant committed criminal trespass.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274,

279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The conviction challenged in this case is for criminal trespass. A conviction for criminal trespass requires proof beyond a reasonable doubt that the defendant "knowing [he] does not have the owner's effective consent to do so, enters or remains on property, or a portion thereof. *See* T.C.A. § 39-14-405 (2009).

The evidence, considered in the light most favorable to the State, proves that the Defendant entered the victim's property, and the victim told the Defendant multiple times to leave the property. The Defendant did not "immediately" leave the premises, but rather slowly backed away from the victim over the course of a few minutes. *See* T.C.A. § 39-14-405(c). The Defendant initially retreated to his vehicle in the road where he continued to verbally engage the victim and while doing so, stepped back onto the victim's property.

The jury heard the Defendant testify that he did not step back onto the victim's property after his initial retreat to his vehicle; however, the jury also heard the victim describe the course of events. As we earlier stated, all questions of credibility are determined by the jury, which is the "primary instrumentality of justice" in matters of credibility of witness testimony. *Bolin*, 405 S.W.2d at 771; *see also*, *Bland*, 958 S.W.2d at 659; *Liakas*, 286 S.W.2d at 859. It is not within this Court's discretion to re-weigh and determine the credibility of witnesses. *See Matthews*, 805 S.W.2d at 779.

Accordingly, we conclude that the evidence is sufficient to support the conviction for criminal trespass beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

### B. Jury Instructions

The Defendant contends that the trial court erred in refusing to instruct the jury as to the presumption in Tennessee Code Annotated section 39-11-611( c ) that:

> Any person using force intended or likely to cause death or serious bodily injury within a residence, business, dwelling or *vehicle* is presumed to have held a reasonable belief of imminent death or serious bodily injury to self, family, a member of the household or a person visiting as an invited guest,

when that force is used against another person, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, business, dwelling or *vehicle*, and the person using defensive force knew or had reason to believe that an unlawful and forcible entry occurred.

(emphasis added). The State responds that the facts presented at trial did not warrant this instruction and, thus, the trial court did not err in refusing to give this instruction to the jury.

A trial court has a "duty to give a complete charge of the law applicable to the facts of the case." *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). However, Tennessee law does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn.1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). In determining whether jury instructions are erroneous, this court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998).

"In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001) (citing *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn.1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)). When the entire charge, read as a whole, fully and fairly sets out the applicable law, the trial judge does not err in denying an inaccurate or inapplicable instruction to the case when the charge, in its entirety, "fully and fairly sets out the applicable law." *Id.* (citing *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987)).

Tennessee Code Annotated section 39-11-611( c ) defines the statutory presumption in favor of self-defense when a defendant is in his vehicle:

Any person using force intended or likely to cause death or serious bodily injury within a . . . vehicle is presumed to have held a reasonable belief of imminent death or serious bodily injury to self . . . when that force is used

against another person, who unlawfully and forcibly enters or has unlawfully and forcibly entered the . . . vehicle, and the person using defensive force knew or had reason to believe that an unlawful and forcible entry occurred.

The Defendant requested that the trial court charge the jury as to this presumption.

The trial court denied this request but provided the following instruction on self-defense to the jury:

If a defendant was not engaged in unlawful activity and was in a place where he or she had a right to be, he or she would also have no duty to retreat before threatening or using force intended or likely to cause serious bodily injury if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

Although this charge provided the general statutory provision defining self-defense, it did not provide the statutory presumption that a defendant who uses force as a result of an invasion into his vehicle is acting in self-defense.

The evidence, viewed in the light most favorable to the Defendant, shows that the Defendant went to the victim's house and the victim told the Defendant to leave. The Defendant retreated to his vehicle but continued to engage the victim in a verbal confrontation. The Defendant opened his truck door and placed his right hand on the steering wheel and his left foot on the floorboard when the victim began to attack the Defendant. The Defendant was pinned against the door jam and then he turned to pull out the gun from the driver's door panel and, thereafter, shot the victim. The Defendant's argument focuses on the entry of the victim's arms and hands into the Defendant's vehicle as the victim struck him. Even should we assume that the victim's hand forcibly entered the vehicle in the course of the victim's attack upon the Defendant, we can not conclude that the Defendant's use of force, the shooting of the weapon, occurred within the vehicle. The Defendant had his hand on the wheel but then turned with his right hand to get the gun, removing himself from the vehicle, and shot the victim who was behind him. Based upon these facts, the trial court did not err in declining to give the instruction as to the presumption. Further, we conclude that the jury instructions provided by the court "fully and fairly set[ ] out the applicable law" as to self-defense. *Sims*, 45 S.W.3d at 9.

Based upon the foregoing, we conclude that the trial court properly charged the jury as to self-defense in this case.  We, therefore, affirm the judgments of the trial court.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.


_____
ROBERT W. WEDEMEYER, JUDGE